1
2
3
4
5
6
7
8
9
10
11

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| PIPE RESTORATION TECHNOLOGIES, LLC, a Nevada Limited Liability Company; ACE DURAFLO SYSTEMS, LLC, a Nevada Limited Liability Company; and PIPE RESTORATION, INC., a California Corporation, | Case No. 8:13-cv-00499-JDE<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL PURSUANT TO RULE 52(a) |
| Plaintiffs,<br>v.<br><br>COAST BUILDING & PLUMBING, INC., a California Corporation d/b/a PIPELINE RESTORATION, PIPE RESTORATION SERVICES, and PIPELINE RESTORATION SERVICES, INC; ROY TERRY, an individual; and DOES 1 through 10, inclusive,<br><br>Defendants. | <u>Trial</u><br>Date:      June 5, 2018<br>Time:      9:00 a.m.<br>Courtroom: 6A<br>Honorable John D. Early |

The above-entitled action came on for a bench trial commencing on June 5 and concluding on June 8, 2018. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure and Local Rule 52-1, based upon the evidence presented at trial and the arguments of counsel for the parties in pretrial filings and at trial, the Court makes the following findings of fact and conclusions of law.

**I.     FINDINGS OF FACT**

1.     The Plaintiffs in this case are Pipe Restoration Technologies, LLC, ACE Duraflo Systems, LLC, and Pipe Restoration, Inc. (collectively, "Plaintiffs"). Final Pretrial Conference Order (Dkt. 257, "FPTCO"), § V, Admitted Facts.

2.     The Defendants are Roy Terry ("Terry") and Pipeline Restoration Plumbing, Inc. ("PRPI") (collectively, "Defendants"); Terry is the founder, sole shareholder and only officer of PRPI. Id.

3.     Plaintiffs and Defendants compete for pipe restoration work involving the use of epoxy in small diameter, potable plumbing applications in residential properties in Orange County. Id.

4.     Plaintiffs have been in the epoxy pipe restoration business since the late 1990s. In approximately October 2008, Defendants began providing epoxy pipe restoration services in Southern California. Id.

5.     Generally, the epoxy small diameter pipe restoration process used by both Plaintiffs and Defendants involves the following steps applied to a piping system: (1) isolate the piping system; (2) dry the interior of the piping system by applying air into the system; (3) clean the interior of the piping system by applying air with an abrasive medium into the system; and (4) apply a liquid epoxy to the interior of the piping system by blowing the epoxy into the system. The epoxy dries, resulting in a new epoxy pipe layer covering the entire interior of the piping system. Id.

6.     In 2008, Terry, whose background is in plumbing and construction, became interested in the epoxy pipe restoration business. While researching the process, Defendants purchased a package of equipment to perform epoxy pipe restoration services for $35,000, which included a large number of cases of epoxy known as AquataPoxy A-61 ("AquataPoxy"). Reporter's Transcript of Court Trial ("RT") 6/5/18, Volume ("Vol.") II, 90:13-19; 91:12-19; 92:19-93:14.

7.     In addition to investing in the equipment and a lease, Defendants purchased parts and specialized equipment, resulting in a total initial investment of over $100,000. RT 6/5/18, Vol. II, 95:19-96:20.

8.     After being advised they would be unable to purchase more AquataPoxy, Defendants investigated using epoxy manufactured by 3M. RT 6/5/18, Vol. II, 97:5-12.

9.     Epoxy used for drinking water systems must be certified for use in one-half inch or larger pipes, including hot water pipes, pursuant to NSF/ANSI Standard 61 ("NSF Standard 61"). RT 6/5/18, Vol. I, 17:16-21; 20:3-8; 40:4-19; 41:7-42:1; RT 6/7/18, Vol. I, 6:24-7:11.

10.     Beginning in late 2008, Defendants began advertising and performing single line pipe restoration services in Orange County using a 3M epoxy known as 162PWX. RT 6/5/18, Vol. II, 97:13-98:4; 102:2-10; RT 6/6/18, Vol. I, 12:4-18; 14:13-19; 15:8-15.

11.     Since at least October 6, 2008 and continuing through the time of trial, one or more of Defendants' websites have stated that the epoxy used in their epoxy pipe restoration services was certified to NSF Standard 61. FPTCO § V, Admitted Facts; RT 6/5/18, Vol. I, 41:9-42:1.

12.     From the time Defendants began performing single line epoxy pipe restoration services in late 2008 until Defendants started using AquataPoxy in early 2009, the 3M epoxy 162PWX was not certified under NSF Standard 61 for use in half-inch hot water potable pipe, although it did have a certification for use in one-inch cold water pipes. RT 6/5/18, Vol. I, 21:13-15; 47:12-16.

13.     A representative of 3M told Terry that the 162PWX epoxy was suitable for use in the applications to which Defendants planned to use it. RT 6/5/18, Vol. II, 97:13-100:7.

14.     Defendants knew the 3M epoxy it was using in late 2008 and early 2009 was not NSF Standard 61 certified for use in half-inch hot water pipes. RT 6/5/18, Vol. I, 45:20-25.

15.     Some time after January 6, 2009, the date Defendants first ordered AquataPoxy for purchase from a dealer, Defendants stopped using 3M epoxy and started using AquataPoxy. RT 6/6/18, Vol. I, 15:12-15; 18:23-25; 19:12-16; 20:6-7; Trial Exhibit ("Exh.") 519 at 5.

16.     Defendants reviewed and relied upon a Certificate of Listing ("Listing") for AquataPoxy issued by IAPMO Research and Testing, Inc. ("IAPMO") stating that AquataPoxy was certified under NSF Standard 61 for use in half-inch hot water pipes. RT 6/6/18, Vol. I, 17:8-18:11; 19:17-20:5; Exh. 132.

17.     Terry was told by the owner of CuraFlo and on that basis understood that AquataPoxy and CuraPoxy were epoxy products manufactured by the same company and contained the same materials, but were simply labelled differently. RT 6/6/18, Vol. I, 20:11-16; 22:3-7.

18.     On October 29, 2009, after Terry asked a representative of Cohesant, the manufacturer/distributor of AquataPoxy, about the significance of changes in AquataPoxy's packaging, Terry was initially advised by the manufacturer that the "product has not changed," but one day later was advised that AquataPoxy was "no longer certified to commercial hot . . . Due to the expense(s) associated with maintaining the commercial hot certification." RT 6/6/18, Vol. I, 23:10-19; 24:14-21; 25:9-23; Exh. 52.

19.     Terry did not believe the information provided by Cohesant because the IAPMO Listing still identified AquataPoxy as certified under NSF Standard 61 for half-inch hot water use, and as a result continued to use AquataPoxy or CuraPoxy, which he understood was materially chemically identical to AquataPoxy. RT 6/6/18, Vol. I, 20:11-16; 24:7-21; 25:9-23; 27:14-28:1.

20.     In 2011, Terry contacted Truesdail Laboratories, Inc. ("Truesdail") regarding testing of two 3M epoxy products that Terry intended to rebrand: 3M 162PWX and 3M 323PWX, which Terry intended to re-brand as AirKote 100 and AirKote 300, respectively. RT 6/5/18, Vol. I, at 88:23-89:1; RT 6/6/18, Vol. I, 29:3-30:16.

21.     On August 31, 2011, Truesdail advised Defendants by letter that AirKote 100 and AirKote 300 had been tested and were found to be in compliance with NSF Standard 61 for use in half-inch hot water pipe. Exh. 235. The actual certification paperwork from Truesdail was delayed, in part, because Truesdail did not have the proper paper stock for the certificate. Exh. 38 at 1.

22.     At some point after August 31, 2011, when Terry understood Truesdail to have certified the AirKote products as compliant with NSF Standard 61, Defendants stopped using AquataPoxy and began using AirKote 100 and AirKote 300, the rebranded 3M products, in its pipe restoration projects. RT 6/6/18, Vol. I, 38:18-39:14.

23.     On October 28, 2013, Terry was advised that Truesdail intended to delist the epoxies because there were discrepancies in Truesdail's testing. Exh. 65; RT 6/6/18, Vol. I, 42:4-15.

24.     On October 28, 2013, in response to the statement from Truesdail, Terry telephonically directed his staff to stop using the AirKote/3M epoxy materials and instead use remaining stocks of AquataPoxy in pipe restoration projects. RT 6/6/18, Vol. I, 42:21-43:6.

25.     In late 2013, Defendants submitted the AirKote 100 and AirKote 300 products, identical to 3M 162PWX and 3M 323PWX, respectively, for testing to IAPMO (RT 6/6/18, Vol. I, 43:14-21; 45:1-4). On December 12, 2013, IAPMO issued a test report stating that the AirKote 100 epoxy complied with NSF Standard 61 for domestic hot water, but did not comply with immediate return to service standards (Exh. 120); on December 16, 2013, IAPMO issued a

test report stating that AirKote 100 epoxy complied with NSF Standard 61 for use in domestic hot water at an exposure rate of 490 in$^2$/liter (Exh. 68).

26.    At the time Defendants received the IAPMO testing results in December 2013, a representative of IAPMO told Terry that based upon the passing test, a certification would be issued. Based upon that assurance, Defendants began using the AirKote epoxy products again in pipe restoration projects. RT 6/6/18, Vol. I, 46:11-47:15.

27.    IAPMO issued a Listing for the AirKote epoxy products effective from: May 2014 to May 2015 (Exh. 624); May 2015 to May 2016 (Exh. 659); May 2016 to May 2017 (Exh. 625); and May 2017 to May 2018 (Exh. 626).

28.    In June and July 2014, an issue arose regarding IAPMO's compliance with its own internal certification procedures that caused IAPMO to question AirKote listings pending a site inspection of the location where the products were manufactured. The issue was resolved after IAPMO conducted a site visit at the 3M plant in England where the epoxy products were manufactured. RT 6/5/18, Vol. II, 58:10-19, 60:1-6, 69:16-71:1. Terry did not understand that the issues IAPMO had regarding its internal certification procedures had any impact on the existing certificate he had for the AirKote products. RT 6/6/18, Vol. I, 49:12-23; 86:19-88:19.

29.    Defendants received revenue of $5,875 in 2008 and $3,685 from January 1 to January 13, 2009 in connection with single line epoxy pipe restoration projects. RT 6/5/18, Vol. II, 86:4-13; Exhibit A to Exh. 527 at 5.

30.    Defendants had no documentary evidence to support any costs of doing business for 2008 or 2009 (RT 6/7/18, Vol. I, 89:18-90:6) and could not estimate a profit margin for the epoxy restoration portion of his business for that time period (RT 6/7/18, Vol. I, 89:18-24; 90:21-91:8).

## II.  CONCLUSIONS OF LAW

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338(a) and (b). The Court has jurisdiction over Plaintiffs' related state law claim pursuant to 28 U.S.C. § 1367.

2.     Venue is proper with this Court under 28 U.S.C. § 1391(b) and (c).

### *Legal Standards Regarding Plaintiffs' Claims*

3.     There are five elements to a false advertising claim under Section 43(a) of the Lanham Act: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products." Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997) (footnotes omitted); see also 15 U.S.C. § 1125(a)(1)(B); Skydive Ariz., Inc. v. Quattrocchi, 673 F.3d 1105, 1110 (9th Cir. 2012); Ojmar US, LLC v. Sec. People, Inc., 2018 WL 1640126, at *4 (N.D. Cal. Apr. 5, 2018).

4.     "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." Southland, 108 F.3d at 1139 (citing Castrol Inc. v. Pennzoil Co., 987 F.2d 939, 946 (3d Cir. 1993)).

5.     "When evaluating whether an advertising claim is literally false, the claim must always be analyzed in its full context." Southland, 108 F.3d at 1139. "Thus courts have held that a claim can be literally false 'by necessary implication.'" Id. (citation omitted).

6.     "[T]he Lanham Act encompasses more than 'blatant falsehoods.'" Itex Corp. v. Global Links Corp., 90 F. Supp. 3d 1158, 1168 (D. Nev. 2015) (quoting William H. Morris Co. v. Grp. W. Inc., 66 F.3d 255, 257 (9th Cir. 1995) (per curiam)). "'It embraces innuendo, indirect intimations, and ambiguous suggestions evidenced by the consuming public's misapprehension of the hard facts underlying an advertisement.'" Itex Corp, 90 F. Supp. 3d at 1168 (quoting William H. Morris Co., 66 F.3d at 257-58).

7.     "Where an advertisement is literally false, a presumption arises that consumers were in fact deceived and the burden shifts to the defendant to prove otherwise." Itex, 90 F. Supp. 3d at 1171 (quotation marks and citation omitted).

8.     "A statement is material if it is 'likely to influence the purchasing decision.'" Itex, 90 F. Supp. 3d at 1172 (quoting Southland, 108 F.3d at 1139).

9.     If a statement is literally false, materiality may be presumed. Itex, 90 F. Supp. 3d at 1173 (citing Pizza Hut, Inc. v. Papa John's Int'l, Inc., 227 F.3d 489, 497 (5th Cir. 2000)).

10.    False and misleading statements made on the internet are statements in interstate commerce. See AECOM Energy & Constr., Inc. v. Ripley, 2017 WL 4326373, at *6 (C.D. Cal. Sept. 28, 2017).

11.    Commercial injury is generally presumed "when defendant and plaintiff are direct competitors and defendant's misrepresentation has a tendency to mislead consumers." Thermolife Int'l, LLC v. Gaspari Nutrition Inc., 648 F. App'x 609, 616 (9th Cir. 2016) (quoting TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 826 (9th Cir. 2011)).

12.    Claims for false advertising under the Lanham Act do not lie when the allegedly false advertisements constitute non-actionable puffery. Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911 F.2d 242, 245 (9th Cir. 1990) (per curiam).

13.     "A statement is considered puffery if the claim is extremely unlikely to induce consumer reliance." <u>Newcal Indus., Inc. v. Ikon Office Sol.</u>, 513 F.3d 1038, 1053 (9th Cir. 2008). "Puffing is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely . . . ." <u>Southland</u>, 108 F.3d at 1145 (internal quotation marks omitted).

14.     15 U.S.C. § 1117(a) provides, in pertinent part, that "[w]hen a violation of any right . . . under section 1125(a) or (d) of this title . . . shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) costs of the action."

15.     In a false advertising case under the Lanham Act, a plaintiff need not demonstrate actual damage to obtain an accounting of defendant's profits. <u>Pom Wonderful LLC v. Purely Juice, Inc.</u>, 2008 WL 4222045, *15 (C.D. Cal. July 17, 2008); <u>see also</u> <u>Southland</u>, 108 F.3d at 1146. "[T]he preferred approach allows the district court in its discretion to fashion relief, including monetary relief, based on the totality of the circumstances." <u>Southland</u>, 108 F.3d at 1146.

16.     As to whether willfulness is required for purposes of disgorgement in a Lanham Act false advertising case, the prevailing view appears to be that there needs to be a showing of "willful deceptiveness," <u>see</u> 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27:43 (5th ed. 2018) ("To recover the defendant's profits made as a result of its false advertising, most courts will require that plaintiff prove some form of deceptive intent or 'willful deceptiveness.'" (footnote omitted)); <u>Merck Eprova AG v. Gnosis S.P.A.</u>, 760 F.3d 247, 261 (2d Cir. 2014) ("[U]nder any theory, a finding of defendant's willful deceptiveness is a prerequisite for awarding profits." (citation omitted)), or at a minimum, willfulness should be considered in determining the equity of awarding defendant's profits. <u>See</u> <u>Nat'l Prods., Inc. v. Gamber-Johnson LLC</u>,

734 F. Supp. 2d 1160, 1165 (W.D. Wash. 2010) (court should take into consideration the jury's finding that defendant engaged in the false advertisement deliberately); Wildlife Research Ctr., Inc. v. Robinson Outdoors, Inc., 409 F. Supp. 2d 1131, 1135 (D. Minn. 2005) ("To determine whether the interests of justice support an award of defendant's profits, the court may consider evidence of willfulness and bad faith by defendant."). Courts applying the willfulness requirement in false advertising cases rely on authority imposing a willful infringement requirement in trademark infringement cases. See, e.g., Emco, Inc. v. Obst, 2004 WL 1737355, at *3 (C.D. Cal. May 7, 2004) ("In the absence of evidence that DBW was damaged, it can receive an award of Mared's profits only by showing that Mared's conduct was willful." (citing Adray v. Adry-Mart, Inc., 76 F.3d 984, 988 (9th Cir. 1996) (as amended) (finding willful infringement as a prerequisite to an award of defendant's profits where plaintiff was not seeking the defendant's profits as a measure of his own damages))).

17.     In cases of trademark infringement, willfulness is a prerequisite for award of defendant's profits. Stone Creek, Inc. v. Omnia Italian Design, Inc., 875 F.3d 426, 441 (9th Cir. 2017) (as amended). A prior district court opinion, Pom Wonderful, 2008 WL 4222045, at *15, found willfulness was not required in a false advertising case. However, Pom Wonderful relied on Fifth Circuit and Third Circuit cases, Quick Techs., Inc. v. Sage Grp. Plc, 313 F.3d 338, 348-49 (5th Cir. 2002) (reaffirming a factor-based approach) and Banjo Buddies, Inc. v. Renosky, 399 F.3d 168, 174 (3d Cir. 2005) (finding willfulness is an important equitable factor to consider) that were issued prior to the Ninth Circuit's decision in Stone Creek and concluded that willfulness was not a prerequisite after considering a 1999 amendment to Section 1117(a). Stone Creek, however, concluded that the 1999 amendment did not "change the foundation of Ninth Circuit precedent – willfulness remains a prerequisite for awarding a defendant's profits." 875 F.3d at 441.

18.     "The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a).

19.     The Lanham Act further provides "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a).

20.     The district court must determine monetary awards in a Lanham Act action in light of equitable considerations. See Maier Brewing Co. v. Fleischmann Distilling Corp., 390 F.2d 117, 120 (9th Cir. 1968). "The equitable limitation upon the granting of monetary awards . . . would seem to make it clear that such a remedy should not be granted as a matter of right." Id. "When fashioning a remedy in a given case, the court must rely 'not merely on the legal conclusion of liability, but [must] also . . . consider the nature of the infringing actions, including the intent with which they were motivated and the actuality, if any, of their adverse effects upon the aggrieved party.'" Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1406 (9th Cir. 1993) (alterations in original) (quoting Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 918 (Fed. Cir. 1984) (applying Ninth Circuit law)), abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co., 839 F.3d 1179 (9th Cir. 2016) (en banc) (per curiam); see also Highway Cruisers of Cal., Inc. v. Sec. Indus., Inc., 374 F.2d 875, 876 (9th Cir. 1967) ("One may get just enough relief to stop the evil . . . ."). A plaintiff is not entitled to a "windfall" of an award. Bandag, 750 F.2d at 918.

21.     The Lanham Act authorizes reasonable attorney fee awards to prevailing parties in "exceptional" cases. 15 U.S.C. § 1117(a); SunEarth, 839 F.3d at 1180.

22.    In analyzing a request for attorney fees under the Lanham Act, courts examine the "totality of the circumstances" to determine if the case was exceptional, "exercising equitable discretion in light of the nonexclusive factors" identified by the Supreme Court in <u>Octane Fitness, LLC v. ICON Health & Fitness, Inc.</u>, 572 U.S. 545 (2014) and <u>Fogerty v. Fantasy, Inc.</u>, 510 U.S. 517 (1994). <u>SunEarth</u>, 839 F.3d at 1180-81 (explaining that the Supreme Court's recent decisions clarifying how courts should analyze fee requests under the Patent Act altered the analysis of fee applications under the Lanham Act since the fee-shifting provisions in both acts are parallel and identical).

23.    The factors the Court should consider in assessing the totality of the circumstances to determine if a case was exceptional, warranting a fee award, include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." <u>Octane Fitness</u>, 572 U.S. at 554 n.6 (quoting <u>Fogerty</u>, 510 U.S. at 534 n.19). An exceptional case is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." <u>Id.</u> at 554. Sanctionable conduct is not the appropriate benchmark for this analysis; instead, "a district court may award fees in the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees." <u>Id.</u> at 555.

24.    "[W]hile willfulness used to be an explicit factor that could support an award of attorney fees under § 1117(a), that is no longer the case," <u>Morton & Bassett, LLC v. Organic Spices, Inc.</u>, 2017 WL 3838097, at *5 (N.D. Cal. Sept. 1, 2017), and courts have declined to award attorneys' fees based solely on a finding of willfulness. <u>See, e.g.</u>, <u>Lerma v. Armijo</u>, 2017 WL 2233617, at *3

(C.D. Cal. May 22, 2017) (declining to conclude a case was exceptional based on defendants' willful and deliberate infringement); <u>Anhing v. Corp. v. Thuan Phong Co. Ltd.</u>, 2016 WL 6661178, at *3-4 (C.D. Cal. Jan. 25, 2016) (declining to award attorneys' fees merely because the jury made a finding of willful infringement, explaining that "[w]hile a jury finding of willful infringement is relevant to the question of whether a case is exceptional, it is insufficient on its own to support an award of fees in the absence of some aggravating circumstance or heightened level of culpability" (citation omitted)); <u>Apple, Inc. v. Samsung Elecs. Co.</u>, 2014 WL 4145499, at *11 (N.D. Cal. Aug. 20, 2014) (concluding, based on the totality of the circumstances, the case was not exceptional).

25.     Even assuming a court concludes a case is "exceptional," whether to award attorney fees remains within the court's discretion, as the Lanham Act "provides that the court <u>may</u> award fees; it does not require them." <u>Anhing Corp.</u>, 2016 WL 6661178, at *2 (citation omitted); <u>see also</u> <u>Caiz v. Roberts</u>, 2017 WL 830386, at *2 (C.D. Cal. Mar. 2, 2017).

26.     "A plaintiff seeking a permanent injunction must establish: '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" <u>Obesity Research Inst., LLC v. Fiber Research Int'l, LLC</u>, 310 F. Supp. 3d 1089, 1128 (S.D. Cal. 2018) (quoting <u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006)).

27.     A competitor need not establish injury to obtain an injunction. <u>Southland</u>, 108 F.3d at 1145 (citing <u>Harper House, Inc. v. Thomas Nelson, Inc.</u>, 889 F.2d 197, 210 (9th Cir. 1989)).

28. "[D]istrict courts should apply 'traditional equitable principles' in deciding whether to grant permanent injunctive relief, . . . and the decision is 'an act of equitable discretion by the district court . . . .'" Reno Air Racing Ass'n, Inc. v. McCord, 452 F.3d 1126, 1137-38 (9th Cir. 2006) (quoting eBay Inc., 547 U.S. at 391-92).

29. "[T]raditional equitable principles do not permit" the application of "broad classifications" or "categorical rule[s]" in applying the four factor test for issuing a permanent injunction. eBay Inc., 547 U.S. at 393.

30. Section 17500 of the California Business and Professions Code makes it unlawful for Defendants to make "any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

31. "An advertisement is false or misleading under Section 17500 if it is likely to deceive members of the public; actual deception need not be demonstrated." Pom Wonderful, 2008 WL 4222045, at *12. "The false or misleading nature of the advertisement is viewed from the perspective of a 'reasonable consumer,' or the type of consumer to whom the advertisement is directed." Id. (quoting Lavie v. Procter & Gamble Co., 105 Cal. App. 4th 496, 509-10 (2003) (a reasonable consumer need not be exceptionally acute and sophisticated or necessarily be wary or suspicious of advertising claims)).

32. "Where, as in this case, a plaintiff establishes a claim under the Lanham Act, the plaintiff is entitled to the same relief under Section 17500." Pom Wonderful, 2008 WL 4222045, at *12 (citing J.K. Harris & Co. v. Kassel, 253 F. Supp. 2d 1120, 1130 n.9 (N.D. Cal. 2003)).

33. California's unfair competition law ("UCL") defines unfair competition as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law (§ 17500)]." Cal. Bus. & Prof. Code § 17200; see also

<u>Sybersound Records, Inc. v. UAV Corp.</u>, 517 F.3d 1137, 1151 (9th Cir. 2008) ("Unlawful acts are 'anything that can properly be called a business practice and that at the same time is forbidden by law . . . be it civil, criminal, federal, state, or municipal, statutory, regulatory, or court-made' . . . . [F]raudulent acts are ones where members of the public are likely to be deceived." (internal citations omitted)).

34.    "The UCL's purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." <u>Pom Wonderful</u>, 2008 WL 4222045, at *13 (citation omitted).

35.    "Like a claim under Section 17500, to state an unfair competition claim under California law, it is not necessary to show that the advertising at issue actually deceived any consumers; rather, 'one need only show that "members of the public are likely to be deceived."'" <u>Pom Wonderful</u>, 2008 WL 4222045, at *13 (citation omitted); <u>see also</u> <u>Day v. AT & T Corp.</u>, 63 Cal. App. 4th 325, 332 (1998) ("To state a cause of action under [Sections 17200 and 17500] for injunctive relief, it is necessary only to show that 'members of the public are likely to be deceived.' Actual deception or confusion caused by misleading statements is not required." (internal citation omitted)).

36.    "[A]ny violation of California's false advertising law is necessarily a violation of the unfair competition law." <u>Pom Wonderful LLC</u>, 2008 WL 4222045, at *13 (citation omitted).

37.    "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction." Cal. Bus. & Prof. Code § 17203.

38.    Federal Rule of Civil Procedure 54(d)(1) provides that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." <u>See also</u> 28 U.S.C. § 1920.

39.     The Ninth Circuit has interpreted Rule 54(d)(1) as creating "a presumption for awarding costs to prevailing parties; the losing party must show why costs should not be awarded." <u>Save Our Valley v. Sound Transit</u>, 335 F.3d 932, 944-45 (9th Cir. 2003).

40.     Rule 54(d)(1) "vests in the district court discretion to refuse to award costs." <u>Ass'n of Mex.-Am. Educators v. California</u>, 231 F.3d 572, 591 (9th Cir. 2000) (en banc).

41.     When determining whether to exercise that discretion, "[a]ppropriate reasons for denying costs include: (1) the substantial public importance of the case, (2) the closeness and difficulty of the issues in the case, (3) the chilling effect on future similar actions, (4) the plaintiff's limited financial resources, and (5) the economic disparity between the parties." "This is not 'an exhaustive list of "good reasons" for declining to award costs,' but rather a starting point for analysis." <u>Escriba v. Foster Poultry Farms, Inc.</u>, 743 F.3d 1236, 1247-48 (9th Cir. 2014) (citing <u>Ass'n of Mex.-Am. Educators</u>, 231 F.3d at 592-93).

42.     The Ninth Circuit has affirmed the denial of costs when, for instance, a prevailing plaintiff in a contract action recovered substantially less in damages than were initially claimed and the defendant prevailed on two affirmative defenses. <u>See</u> <u>Champion Produce, Inc. v. Ruby Robinson Co.</u>, 342 F.3d 1016, 1022-23 (9th Cir. 2003); <u>see also, e.g.</u>, <u>Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.</u>, 2012 WL 12918390, at *2-3 (C.D. Cal. July 8, 2012) (declining to award costs in patent infringement case where defendants were "only partially successful in litigating" the case).

### *Conclusions Regarding Plaintiffs' Claims*

43.     From October 2008 until January 2009, Defendants falsely represented in interstate commerce that they were using an epoxy certified for use in half inch pipes for hot water in their pipe restoration business when, in

truth and fact, the epoxy Defendants intended to use and did use in projects commencing in November 2008 until January 2009 was not so certified.

44. The false statement above was intentionally and willfully made by Defendants during that time period set forth above, was material, and actually deceived or had a tendency to deceive a substantial segment of its target audience for the time period specified in paragraph 43.

45. Harm to Plaintiffs, competitors of Defendants, is presumed.

46. Plaintiffs have not met their burden to show that any other representations by Defendants regarding NSF certification other than those set forth above were willfully false.

47. Plaintiffs have not met their burden to prove that Defendants' other allegedly false statements, specifically:

Defendants' [epoxy pipe restoration] process stops all future corrosion of the piping system; Defendants' [epoxy pipe restoration] process results in no waste to landfills; Defendants' pipe restoration service is the "only solution" to prevent slab leaks or other pinhole leaks; Defendants' epoxy materials have been in use worldwide for over 45 years and have been applied to more than 5,000 miles of domestic water lines in the United Kingdom alone (later changed to state that their technology and materials have been in use for over 45 years in 85,000 miles of pipe); and Defendants are the only company that specifically targets the repair of single water lines (later changed to state they are the "only company offering a single line service . . . .") [Plaintiffs' Memorandum of Contentions of Fact and Law (Dkt. 250) at 8 n.2]

were either willfully false or were not mere puffery. For example, Terry testified that Defendants' epoxy process would stop future corrosion upon the interior of the piping system; Plaintiffs appeared to contend that possible corrosion on the exterior of the system renders the representations false. The Court disagrees

based upon how a reasonable consumer would interpret the representation. Similarly, Plaintiff appeared to imply during trial that the fact that spent epoxy cartridges would be thrown away after the process rendered the representation regarding "no waste to landfills" false; again, the Court disagrees based upon a reasonable interpretation that the representation referenced waste from having to send corroded metal piping to landfills, rather than <u>de minimis</u> waste from used epoxy cartridges. The Court finds that Plaintiffs have not proved that the representations regarding the worldwide use of the "epoxy materials" are false or willfully false. Lastly, the representations regarding Defendants' service as "the only" company or service providing the specified service, which, in the context of all of the evidence offered at trial, the Court interprets as a statement of opinion that Defendants' service is the "best" such service, is classic puffery and was intended and would have been reasonably interpreted by consumers as a mere general, subjective claim about the service.

48.     Plaintiffs have shown Defendants willfully violated 43(a) of the Lanham Act and engaged in unfair trade practices and unfair competition under California Business and Professions Code §§ 17200 et seq., and § 17500 solely with respect to the NSF certification representation from October 1, 2008 to January 13, 2009.

### Legal Standards Re Defendants' Affirmative Defense of Unclean Hands[1]

49.     "[E]quity requires that those seeking its protection shall have acted fairly and without fraud or deceit as to the controversy in issue." <u>Ellenburg v. Brockway, Inc.</u>, 763 F.2d 1091, 1097 (9th Cir. 1985). "Though equitable in nature, the unclean hands doctrine bars claims for money damages as well as those for equitable relief." <u>POM Wonderful LLC v. Coca Cola Co.</u> ("<u>Coca</u>

---

[1]     Certain affirmative defenses raised by Defendants were addressed in pretrial motions in limine. Dkt. 256. Unclean hands is the only affirmative defense Defendants raised at trial or included in their proposed Findings of Fact and Conclusions of Law. <u>See</u> Dkt. 270-1 at 9.

18

Cola"), 166 F. Supp. 3d 1085, 1091 (C.D. Cal. 2016). The affirmative defense of unclean hands requires proof of the following elements: (1) the plaintiff engaged in inequitable conduct; and (2) the conduct "relates to the subject matter of its claims." Levi Strauss & Co. v. Shilon, 121 F.3d 1309, 1313 (9th Cir. 1997) (quoting Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 847 (9th Cir. 1987)); Coca Cola, 166 F. Supp. 3d at 1092. The relevant inquiry is "not [whether] the plaintiff's hands are dirty, but [whether] he dirtied them in acquiring the right he now asserts, or [whether] the manner of dirtying renders inequitable the assertion of such rights against the defendants." Ellenburg, 763 F.2d at 1097 (citation omitted). "Plaintiff's inequitable conduct is the basis for a valid defense only if it relates in some way to the subject matter in litigation.'" Coca Cola, 166 F. Supp. 3d at 1092 (citation omitted).

### Conclusions Re Defendants' Affirmative Defense of Unclean Hands

50.     Defendants' unclean hands defense is based on Defendants' allegations that (a) Plaintiffs sometimes applied their epoxy at a thickness that is greater than the thickness listed on Plaintiffs' NSF certification, and (b) Plaintiffs made negative comments about Defendants to customers.

51.     The Court finds, as a matter of equity, Defendants' evidence regarding the epoxy thickness and comments made by Plaintiffs' employees does not render it inequitable for Plaintiffs to assert the claims raised in the action.

### Remedies to Which Plaintiffs are Entitled

52.     The Court finds that Plaintiffs have established that Defendants have violated Section 43(a) the Lanham Act and Sections 17200 et seq. and Section 17500 of the California Business and Professions Code.

53.     The Court finds Plaintiffs are entitled to Defendants' profits from epoxy pipe restoration work for the following time periods: November 1, 2008, the date of Defendants' first single line revenue, through January 13, 2009. The Court credits Terry's testimony in this case, including his testimony that he

ceased using 3M epoxy after his January 6, 2009 order of AquataPoxy from a dealer. Assuming a week's time for delivery and other alterations to switch to AquataPoxy, the Court finds that January 13, 2009 would have been the last date in 2009 when Defendants might still have been using 3M epoxy. The Court finds this is the only period about which Plaintiffs have met their burden to demonstrate willfulness justifying disgorgement of profits.

54.     Defendants' revenue from epoxy pipe restoration work for such time period is $9,560.

55.     Defendants have not established any allowable costs to be deducted from such revenue. However, the Court, relying upon principles of equity, notes that at the relevant time, Defendants were just starting their business, had spent significant amounts in testing and equipment costs, and certainly had labor and material costs for each job. Terry estimated his general margins for his construction business at the time to be approximately 15%. See RT 6/7/18, Vol. I, 90:7-20. The Court, applying principles of equity, finds that it would be an unfair windfall to award Plaintiffs the entirety of Defendants' revenue during the relevant period. The Court also notes, without casting blame, that the amount of time this case has taken to prosecute to trial, may partly be the reason why Defendants were no longer able to reconstruct costs incurred nearly ten years prior to trial. The Court therefore reduces the revenue award by 75% to account for a reasonably and conservatively estimated equitable profit margin of 25%.

56.     Therefore, the Court finds that Plaintiffs are entitled to Defendants' profits in the amount of $2,390 for the period from November 1, 2008 to January 13, 2009 and awards that amount in favor of Plaintiffs and against Defendants, who are jointly and severally liable for this amount. The Court finds no other award monetary relief is warranted in this case.

57.     Applying principles of equity as directed by the Supreme Court in eBay Inc., the Court finds that Plaintiffs are not entitled to a permanent

injunction. In particular, the Court considers the balance of hardships and the public interest, and finds that the evidence in this case reflects that Defendants, after January 2009, have not willfully made misrepresentations, and to the contrary, have spent significant time and resources to attempt to ensure proper certifications accompany their services.

58.     The Court finds, having considered the totality of the circumstances, that this is not an exceptional case warranting an award of attorneys' fees. Although the Court found willful misrepresentations by Defendants covering a period of less than two and one half months, the Court notes that Plaintiffs sought to recover for a period totaling more than seven years and did not obtain injunctive relief.

59.     In light of the outcome of this action which resulted in a denial of injunctive relief and a disgorgement of profits from a far narrower period of time than that sought by Plaintiffs, as well as the outcome of other claims and counterclaims asserted in the action, and after considering, among other things, the closeness and difficulty of the issues in the case, and the economic disparity between the parties, the Court exercises its discretion to not award costs to Plaintiffs.

Counsel for Defendants is directed to lodge a proposed judgment within seven (7) days from the date of this Order. Plaintiffs shall have seven (7) days from the date of lodging of the proposed judgment to file any objections to the proposed judgment.

IT IS SO ORDERED.

Dated: November 16, 2018

_____
JOHN D. EARLY
United States Magistrate Judge